# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | | |
|---|---|---|
| STANLEY FOGG and HELEN FOGG, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 2:14-cv-454-GZS |
| | ) | |
| OCWEN LOAN SERVICING, LLC, | ) | |
| | ) | |
| Defendant | ) | |

## *MEMORANDUM DECISION AND ORDER ON MOTION TO AMEND*

Plaintiffs Stanley and Helen Fogg ("the Foggs") seek to amend their complaint to set forth additional facts, add two parties, Bank of New York Mellon ("Mellon Bank") and Bank of America, N.A. ("Bank of America"), and add claims for (i) violation of the Maine Consumer Credit Code, 9-A M.R.S.A. §§ 9-403(F)-(G), against all defendants, (ii) violation of the Maine Unfair Trade Practices Act ("UTPA"), 5 M.R.S.A. § 205-A *et seq.*, against defendants Ocwen Loan Servicing, LLC ("Ocwen") and Mellon Bank, (iii) negligence, against all defendants, and (iv) intentional and/or negligent infliction of emotional distress, against all defendants. *See generally* Plaintiffs' Motion To Amend Complaint ("Motion") (ECF No. 16); [Proposed] First Amended Complaint ("Proposed Complaint"), Exh. 1 (ECF No. 16-1) thereto.

Ocwen does not object to amending the complaint to add the Foggs' proposed supplemental facts and the exhibits referenced therein, but argues that the Motion should otherwise be denied on the basis that three of the four proposed new claims – those seeking redress for UTPA violations, negligence, and intentional/negligent infliction of emotional distress – are futile. *See* Opposition of Defendant Ocwen Loan Servicing, LLC to Plaintiffs' Motion To Amend and Request for Hearing ("Opposition") (ECF No. 17). It also challenges the addition of new parties. *See id.* at 1-

1

2. I granted Ocwen's request for a hearing, *see* ECF Nos. 18, 21, which was held on March 27, 2015.[1] With the benefit of that hearing, I grant the Motion insofar as it seeks to add new facts, two new parties, and a Maine Consumer Credit Code claim against all defendants, and otherwise deny it. I also direct the plaintiffs to file on the docket, no later than April 15, 2015, an amended complaint consistent herewith.[2]

## I. Applicable Legal Standards

Pursuant to Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend should be granted in the absence of reasons "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. . . . ." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The First Circuit has explained:

> A motion to amend a complaint will be treated differently depending on its timing and the context in which it is filed. . . . As a case progresses, and the issues are joined, the burden on a plaintiff seeking to amend a complaint becomes more exacting. Scheduling orders, for example, typically establish a cut-off date for amendments (as was apparently the case here). Once a scheduling order is in place, the liberal default rule is replaced by the more demanding "good cause" standard of Fed. R. Civ. P. 16(b). This standard focuses on the diligence (or lack thereof) of

---

[1] At the hearing, on the strength of the Foggs' counsel's representation that the only actionable conduct alleged in the Proposed Complaint is conduct postdating the parties' negotiation of a consent judgment in state court on or about August 6, 2013, Ocwen's counsel withdrew a further "procedural objection" that had been set forth at pages 2 to 4 of the Opposition under the heading, "There Are No New Facts and No Previously Unknown Parties." *See* Opposition at 2-4. In addition, during the hearing, I denied an oral motion by the Foggs to further amend the complaint, without prejudice to their filing a new written motion to amend.

[2] On April 7, 2015, the plaintiffs' counsel contacted the Clerk's Office by email to advise that the parties had discovered that they made a mutual mistake with respect to certain allegations in the operative complaint that the defendant had admitted. She noted that she had referenced at least one of the incorrect facts in the Motion, the proposed amended complaint, and at oral argument. She stated that she wished to call this to my attention as soon as possible because the Motion was still pending, and to seek my recommendation for correcting the pleadings. Because the asserted errors are not outcome-determinative and there has not, as yet, been any formal correction, I perceive no need to alter this decision. The plaintiffs are directed to incorporate any needed corrections in the amended complaint that I have ordered be filed by April 15, 2015. The defendant will have the opportunity to respond by way of its answer to that amended complaint.

> the moving party more than it does on any prejudice to the party-opponent. Where the motion to amend is filed after the opposing party has timely moved for summary judgment, a plaintiff is required to show "substantial and convincing evidence" to justify a belated attempt to amend a complaint.

*Steir v. Girl Scouts of the USA*, 383 F.3d 7, 11-12 (1st Cir. 2004) (citations, internal quotation marks, and footnotes omitted).

The Foggs filed the Motion on January 26, 2015, *see* Motion at 1, prior to the parties' February 20, 2015, deadline to amend pleadings and join parties, *see* Scheduling Order (ECF No. 9) at 2. Therefore, the liberal default rule applies.

## II. Discussion

### A. Futility

#### 1. Applicable Legal Standards

An amendment is futile when "the complaint, as amended, would fail to state a claim upon which relief could be granted." *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir. 1996). "In assessing futility, the district court must apply the standard which applies to motions to dismiss under [Federal Rule of Civil Procedure] 12(b)(6)." *Adorno v. Crowley Towing & Trans. Co.,* 443 F.3d 122, 126 (1st Cir. 2006).

The Supreme Court has stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and internal punctuation omitted). This standard requires the pleading of "only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. "A claim has facial plausibility when the plaintiff pleads factual

3

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In ruling on a motion to dismiss under Rule 12(b)(6), a court assumes the truth of all of the well-pleaded facts in the complaint and draws all reasonable inferences in favor of the plaintiff. *Román-Oliveras v. Puerto Rico Elec. Power Auth.*, 655 F.3d 43, 45 (1st Cir. 2011).

## 2. Factual Background

In relevant part, the Foggs allege:

In December 2007, following Helen Fogg's serious illness and layoff from her job, the Foggs fell behind on home loan payments that they had been making since they had obtained a home loan in October 1998 from Countrywide Home Loans, Inc. ("Countrywide"). *See* Proposed Complaint ¶¶ 20-21, 24. Bank of America was, at all relevant times, the Master Servicer of the Foggs' loan, *see id*. ¶ 6, and Mellon Bank was, at all relevant times, the trustee of a trust that obtained their loan and accompanying mortgage, *see id*. ¶¶ 7, 23.

In February 2008, Stanley Fogg suffered a life-threatening illness that left him hospitalized for almost two months. *See id*. ¶ 25. At about this time, Helen Fogg tried to work with Countrywide to obtain a loan modification but was provided conflicting information about the amount that the Foggs needed to send in to be eligible. *See id*. ¶ 26. In mid-2008, the servicing of the Foggs' loan was transferred to Litton Loan Servicing ("Litton"). *See id*. ¶ 27. The Foggs sent two mortgage payments in 2008, but Litton declined to accept further payment in September 2008, informing them that their loan had been referred for foreclosure. *See id*. ¶ 29. Mellon Bank instituted a foreclosure action in December 2008. *See id*. ¶ 30.

Commencing in January 2009, the Foggs engaged in what proved to be fruitless negotiations with Litton to obtain a then newly-available Making Home Affordable loan

4

modification. *See id*. ¶¶ 32-42. In January 2010, in reliance on a statement by Kim Johnson of Litton that, if they did not pay $25,000, their house would be sold that month, the Foggs moved out of their home into a rental property. *See id*. ¶¶ 43, 45. They incurred moving costs and provided a deposit and rent payment for the rental property. *See id*. ¶ 46. Shortly afterwards, Mellon Bank moved for summary judgment in the foreclosure action, but the court denied its motion and dismissed the action. *See id*. ¶ 47.

In February 2011, Mellon Bank filed a new foreclosure action. *See id*. ¶ 48. In May 2011, the Foggs attended a mediation during which they believed that they had agreed with Litton to a "deed in lieu of foreclosure" or "DIL," under which any deficiency in the loan would be waived and the foreclosure ended. *See id*. ¶ 51. During the mediation, they learned for the first time that Johnson had been wrong, and that their house could not have been sold without a judgment. *See id*. ¶ 52. However, by then, it would have caused them further financial hardship to move back into their house because they had moved all of their belongings and were tied to a lease. *See id*. ¶ 53.

Ocwen acquired Litton in June 2011 and began servicing the Foggs' loan in about September 2011. *See id*. ¶¶ 54-55. The DIL never came to fruition, and the foreclosure continued on the docket. *See id*. ¶ 56. In October 2011, the Foggs attended a hearing during which the court extended their deadline to file a motion for summary judgment by 60 days. *See id*. ¶ 57. The Foggs, who attended *pro se*, did not fully understand the process, and they did not file a summary judgment motion. *See id*. ¶¶ 57-58. Following a February 12, 2013, pretrial hearing in the foreclosure action, the Foggs obtained counsel. *See id*. ¶¶ 59-60. The Foggs' counsel delivered a demand letter pursuant to the UTPA to counsel for Mellon Bank, Litton, and Ocwen seeking either

a DIL or a consent to judgment with a waiver of deficiency and compensation to the Foggs for Litton's and Ocwen's unfair and deceptive conduct in mismanaging their loan. *See id*. ¶ 61.

Following a series of negotiations, *see id*. ¶¶ 63-69, the parties consented to a judgment of foreclosure and sale that provided, "no execution shall issue against either Defendant for any deficiency balance[,]" *id*. ¶¶ 70-71. The court entered the judgment on August 8, 2013. *See id*. ¶ 70. The Foggs waived the 90-day redemption period provided by statute. *See id*. ¶ 72. The Foggs paid more than $4,000 for legal representation in the foreclosure action, specifically to negotiate a final resolution and consent judgment that would waive a significant potential deficiency. *See id*. ¶ 74. They believed that everything was finally over and that they would no longer have the mortgage debt hanging over their heads. *See id*. ¶ 73.

However, commencing in November 2013, Ocwen began to bill the Foggs for past-due loan payments, interest, and/or costs of insurance placed on the Foggs' former home. *See id*. ¶¶ 75-103. These dunning notices have continued not only in the face of the court's August 8, 2013, judgment but also despite the Foggs' counsel's intervention on their behalf, Countrywide's recordation, on June 6, 2014, of a discharge of the Foggs' mortgage, the sale of their former home at auction on June 13, 2014, and the Foggs' filing of the instant suit on October 28, 2014. *See id*. ¶¶ 82-103. Ocwen continues to send these notices directly to the Foggs despite the fact that they are represented by counsel. *See id*. ¶ 103.

"Helen Fogg has suffered increased anxiety, irritability, depression, headaches, aches and pains, and desperation as a result of Ocwen's ongoing conduct[,]" and "Stanley Fogg has perseverated on Ocwen's conduct and has experienced increased irritability, depression, inability to enjoy his family and friends, and a lack of desire to be social or even leave the house." *Id*. ¶ 106. The Foggs "feel violated and intimidated[,]" have experienced "increased tension in their

relationship[,]" and "fear that Ocwen is never going to stop harassing them until they pay the money Ocwen claims they owe, which they could never afford." *Id*.

### 3. Proposed UTPA Claim

The UTPA provides a cause of action to "[a]ny person who purchases or leases goods, services or property, real or personal, primarily for personal, family or household purposes and thereby suffers any loss of money or property, real or personal," as a result of a prohibited act. 5 M.R.S.A. § 213(1).

For purposes of their UTPA claim, the Foggs allege that the conduct of Ocwen and Mellon Bank in agreeing to a judgment that satisfied their outstanding debt and then pursuing attempts for 17 months thereafter to collect on the debt was unfair and deceptive. *See* Proposed Complaint ¶ 127. They assert that Ocwen's conduct "was likely to and did cause the Foggs substantial harm in that Ocwen is now seeking over $140,000 from the Foggs on the loan[,]" and "the Foggs incurred over $4,000 in legal representation to finally arrive at the consent judgment which they thought would fully satisfy the debt and avoid exactly what Ocwen has continued to do: collect on the debt." *Id*. ¶¶ 134-35.

Ocwen argues that the claim is futile because the Foggs "do not allege a loss of money or property, substantial or otherwise." Opposition at 5. The Foggs counter that they allege such a loss in legal fees incurred in obtaining the consent judgment that Ocwen disregarded, and that Ocwen's allegations that they owe more than $100,000 constitute a substantial harm. *See* Reply at 3.

Yet, as Ocwen indicates, *see* Opposition at 5, this court has previously rejected an argument that the expense of retaining a lawyer to prevent or dispute allegedly unfair trade practices constitutes a loss of money or property for purposes of the UTPA, *see Poulin v. Thomas Agency*,

7

746 F. Supp.2d 200, 205-06 (D. Me. 2010) (for purposes of the UTPA, monies spent by plaintiffs to retain a lawyer to prevent collection efforts, defend against claims, and/or file suit "are expenses that may be recoverable as attorneys fees – not actual damages"). The Foggs' argument that Ocwen's insistence that they owe more than $100,000 constitutes a loss of money or property likewise falls flat. As this court noted in *Poulin*, "The Law Court . . . has made clear that merely speculative harms are not substantial enough to merit a violation of the UTPA." *Id*. at 206 (citation and internal quotation marks omitted) (holding that plaintiff's speculation that he might have incurred higher finance charges on a student loan as a result of defendant's conduct did not demonstrate a loss of money or property for purposes of the UTPA).[3]

The proposed UTPA claim against Ocwen and Mellon Bank, accordingly, is futile.

### 4. Proposed Negligence Claims

Ocwen next challenges the Foggs' proposed addition of claims against all of the defendants for negligence and negligent infliction of emotional distress, arguing that the Foggs fail to establish that any of the defendants owed them a duty of care. *See* Opposition at 5-6.

"[T]he general rule in Maine is that without more, a mortgagee-mortgagor relationship does not create a duty of care between a bank and a customer." *Hamilton v. Federal Home Loan Mortg. Corp.*, No. 2:13-cv-00414-JAW, 2015 WL 144562, at *17 (D. Me. Jan. 12, 2015) (internal quotation marks omitted).

In *Camden Nat'l Bank v. Crest Constr., Inc.*, 2008 ME 113, 952 A.2d 213, one of the cases cited by the Foggs, *see* Reply at 4, the Law Court vacated a judgment in favor of a mortgagor on her counterclaims against the bank for negligence and breach of fiduciary duty, holding that the

---

[3] At oral argument, the Foggs' counsel sought to distinguish *Poulin* on the basis that the Foggs incurred some legal fees prior to the occurrence of the actionable misconduct alleged in the complaint – specifically, in negotiating the consent judgment. I perceive no material distinction. As in *Poulin*, those costs were incurred "to prevent collection efforts[.]" *Poulin*, 746 F. Supp.2d at 206 (citation and internal quotation marks omitted).

8

bank owed her no duty of care and that the facts did not support a confidential or fiduciary relationship between the two, *see Camden*, 952 A.2d at 216-18, ¶¶ 10-20. The Law Court noted, "The salient elements of a confidential relation are the actual placing of trust and confidence in fact by one party in another and a great disparity of position and influence between the parties to the relation." *Id*. at 217, ¶ 13 (citation and internal quotation marks omitted). It elaborated:

> To demonstrate the necessary disparity of position and influence in such a bank-borrower relationship, a party must demonstrate diminished emotional or physical capacity or . . . the letting down of all guards and bars. . . . . Confidential relations can, and do, exist between such people. On the other hand, an allegation of one party's inexperience or trust will not by itself warrant an adjudication of a confidential relation without a statement of the facts indicating the actual placing of confidence and trust, and the abuse of the relation.

*Id*. (citation and internal quotation marks omitted).

The Foggs argue, as a threshold matter, that it is "essential" to adopt a due care standard pertaining to loan servicers/debt collectors, failing which "Ocwen and other servicers will continue to service . . . loans with impunity in a way that profits them and harms innumerable homeowners." Reply at 4-5. They argue that, once homeowners like themselves fall behind on payments, they become wholly dependent on the discretion and actions of loan servicers, including their provision of information on eligibility for loss mitigation options, leaving them vulnerable. *See id*. at 5.

In any event, the Foggs assert, they trusted and depended upon Ocwen to abide by the judgment entered by the court on August 8, 2013, to which the parties had agreed. *See id*. at 5-6. They assert that there is a great disparity of influence between Ocwen and themselves, that they relied on Ocwen's offer to enter into the consent judgment as a tool to mitigate their harm, thus creating a special relationship, and that Ocwen breached its duty of care toward them by repeatedly attempting to collect on a debt that it had represented would be satisfied through the consent judgment. *See id*. at 6.

9

I decline to hold that there is a special relationship, as a matter of law, between loan servicers and borrowers/mortgagors. The Foggs cite no caselaw indicating that the Law Court has adopted such a stance or would be likely to do so. Indeed, the caselaw cited by both sides suggests the opposite, with the Law Court having refused to recognize any intrinsic special relationship between mortgagors and mortgagees or banks and bank customers. *See, e.g., Hamilton*, 2015 WL 144562, at *17; *Camden*, 952 A.2d at 216-17, ¶¶ 11-15.[4]

Nor, even accepting the truth of the well-pleaded allegations of the Proposed Complaint and drawing reasonable inferences in the Foggs' favor, do they allege facts that, if proven, would make out the existence of a special relationship between themselves and Ocwen or, for that matter, Mellon Bank or Bank of America. As Ocwen points out, *see* Opposition at 7, the complained-of conduct took place in connection with a consent judgment in a foreclosure action between adversary parties, each of whom had counsel. Indeed, the Foggs allege that their counsel initially demanded not only the waiver of any deficiency judgment but also compensation to the Foggs, and that they paid more than $4,000 for legal representation in the foreclosure action, "specifically to negotiate a final resolution and consent judgment that would waive a significant potential deficiency." Proposed Complaint ¶¶ 61, 74.

At oral argument, the Foggs' counsel pointed to the ongoing relationship between the Foggs and Ocwen commencing in 2011 when the Foggs, proceeding *pro se*, unsuccessfully tried to negotiate loss mitigation solutions with Ocwen. She asserted that the Foggs were completely dependent on Ocwen to obtain a DIL or, ultimately, the consent judgment that they did secure and

---

[4] My research indicates that "the majority of cases that have addressed the issue of whether a financial institution owes a duty to a borrower when engaging in the loan modification process have resulted in a holding that such activity generally does not exceed the traditional scope of a money lender, thus resulting in the lack of a duty of care owed by the lender." *Becker v. Wells Fargo Bank NA, Inc.*, No. 2:10-cv-2799-TLN-KJN PS, 2014 WL 3891933, at *19 (E.D. Cal. Aug. 7, 2014).

that, when Ocwen initially began dunning the Foggs following the judgment, they were again unrepresented for a period of time. *See id*. ¶¶ 75-79. Nonetheless, as Ocwen's counsel rejoined, the crux of the Foggs' complaint, as clarified by their counsel at oral argument, is that Ocwen betrayed their trust when, contrary to its representations during the negotiation of the consent judgment, it reactivated and repeatedly carried out collection efforts following the entry of judgment. As Ocwen's counsel argued, this is fatal to the Foggs' negligence claims: during the critical time period of the negotiation of the consent judgment, the Foggs were in an adversarial relationship with Ocwen, and each side was represented by counsel.

The Foggs cannot, on these facts, demonstrate the requisite "diminished emotional or physical capacity or . . . the letting down of all guards and bars" that the Law Court has stated is necessary in a bank-borrower relationship for the imposition of a duty of care. *Camden*, 952 A.2d at 217, ¶ 13.[5]

---

[5] Caselaw cited by the Foggs, *see* Motion at [2]-[3]; Reply at 4-7, does not persuade me otherwise. As noted above, in *Camden*, the Law Court held that the bank owed no duty of care to a mortgagor. *See Camden*, 952 A.2d at 216-18, ¶¶ 10-20. The other cited cases are materially distinguishable. In *Morrow v. Bank of Am., N.A.*, 2014 MT 117, 324 P.3d 1167, the plaintiffs were not advised by any other parties when they allegedly relied on the defendant bank's advice, including advice that it would be in their best interests to deliberately miss a payment and default on their loan. *See Morrow*, 324 P.2d at 1177-78, ¶ 37. Similarly, in *Darling v. Western Thrift & Loan*, 600 F. Supp.2d 189 (D. Me. 2009), a bank representative repeatedly reassured the plaintiffs, who were unrepresented, that their concerns regarding the actual terms of the loan he purported to obtain for them were unfounded, for example, referring to the final loan documents as "just legal stuff." *Darling*, 600 F. Supp.2d at 206-07 (internal quotation marks omitted). In *Dragomir v. Spring Harbor Hosp.*, 2009 ME 51, 970 A.2d 310, the Law Court held that a plaintiff's claim that a psychiatric hospital owed him a duty of care survived a motion to dismiss when he alleged that he was unable to protect himself from abuse by a hospital employee while receiving treatment for schizophrenia. *See Dragomir*, 970 A.2d at 316, ¶ 21. In *Harris v. Soley*, 2000 ME 150, 756 A.2d 499, the Law Court upheld an award of punitive damages against a landlord whose tenants "had to endure the presence of insect and rodent infestations, dead animals, snow falling into the apartment, and a total lack of response from their landlord after repeated complaints." *Harris*, 756 A.2d at 509, ¶ 32. The Law Court did not consider whether the landlord owed a duty of care to his tenants, having affirmed the trial court's imposition of an adverse judgment on liability as a discovery sanction. *See id*. at 506, ¶ 18. The Foggs also cite an unpublished order in *Green Tree Servicing, LLC v. Bowen*, Docket No. AUSBSC RE-15-01 (Me. Sup. Ct. Dec. 12, 2014), a copy of which they have supplied, *see* ECF No. 20, for the proposition that the court granted a motion by defendants to assert claims for UTPA violations, negligence, and intentional/negligent infliction of emotional distress based on servicer mismanagement of the loss mitigation process, *see* Reply at 4. However, this is not apparent from the face of the order, which merely states that it permits the filing of the defendants' first amended answer, affirmative defenses, and counterclaims. *See* ECF No. 20. In any event, the court does not explain its reasoning. *See id*.

The proposed negligence claims against all of the defendants, accordingly, are futile.

### 5. Proposed Intentional Infliction of Emotional Distress Claim

Ocwen finally challenges the Foggs' bid to add a claim for intentional infliction of emotional distress ("IIED") against all of the defendants. *See* Opposition at 6. To make out a claim of IIED, a plaintiff must demonstrate that:

(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct;

(2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community;

(3) the conduct of the defendant caused the plaintiff's emotional distress; and

(4) the emotional distress suffered by the plaintiff was so severe that no reasonable man could be expected to endure it.

*Beaulieu v. Bank of Am., N.A.*, No. 1:14-cv-00023-GZS, 2014 WL 4843809, at *7-*8 (D. Me. Sept. 29, 2014) (citation and internal quotation marks omitted).

Ocwen argues that the Foggs cannot possibly demonstrate that the defendants' conduct was "so extreme and outrageous as to exceed all possible bounds of decency" given that Ocwen merely sent monthly statements and other routine mortgage communications following the entry of a judgment stating that "[n]o execution shall issue against either Defendants on any deficiency balance." Opposition at 6 (internal quotation marks omitted). Ocwen points out that the Foggs do not allege, in either the existing or proposed complaint, that any defendant caused the entry of a deficiency judgment, let alone executed on it. *See id.*

The Foggs counter that the amounts allegedly due were satisfied through the judgment and sale of the property and that, in any event, the judgment stripped Ocwen of the ability to enforce and collect on any alleged deficiency, as a result of which its attempts to collect on the alleged

debt violated the Maine and federal Fair Debt Collection Practices Act. *See* Reply at 5 n.6. They argue that Ocwen's repeated misconduct in attempting to try to collect on a satisfied debt after the issuance of the consent judgment – continuing even after the expiration of the redemption period, the issuance of demand letters to stop, and the filing of the instant suit – constitutes conduct that is "so extreme and outrageous as to exceed all possible bounds of decency, and [must] be regarded as atrocious and utterly intolerable in our civilized society." *Id*. at 8 (citation and internal quotation marks omitted).

"It is up to the courts to determine whether a charge of IIED meets all of the criteria, including whether the alleged acts were sufficiently extreme and outrageous, but where reasonable people may differ, it is for the jury, subject to the control of the Court, to determine whether, in a particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Hinkley v. Baker*, 122 F. Supp.2d 57, 61 (D. Me. 2000) (citation and internal punctuation omitted).

I conclude that the claim is, indeed, futile. In reaching that conclusion, I have focused, as did counsel at oral argument, on whether this case aligns more closely with *Beaulieu*, a case that I called to the parties' attention prior to oral argument, *see* ECF No. 23, or *Hamilton*, the case most closely on point of several cited by the Foggs, *see* Reply at 7-8.

In *Beaulieu*, Judge Singal granted a defendant bank's motion to dismiss an IIED claim by a plaintiff borrower-mortgagor, *see Beaulieu*, 2014 WL 4843809, at *8, while, in *Hamilton*, Judge Woodcock held that a borrower's "long litany of allegations against" a lender sufficed to withstand the attempt to dismiss his IIED claim, *see Hamilton*, 2015 WL 144562, at *16.

The plaintiff in *Beaulieu*, a disabled veteran, alleged that after he defaulted on his home loan, the bank failed to provide a mandatory notice to the Department of Veterans Affairs ("VA") that would have triggered foreclosure-avoidance counseling, instead initiating a foreclosure action

13

against him. *See Beaulieu*, 2014 WL 4843809, at *3. The plaintiff alleged that, absent the benefit of the required counseling, he believed that the service of the summons and complaint obliged him to vacate his residence immediately and that the bank would then secure and maintain the property. *See id*. He alleged that he did, in fact, immediately vacate the premises, but that the bank did not secure or maintain it. *See id*. As a result, he alleged, the residence was rendered valueless when the pipes froze, it flooded, and it was left open to the vagaries of Maine weather for more than four years. *See id*. He asserted that he suffered increased stress and distress, exacerbating his preexisting post-traumatic stress disorder. *See id*.

> Judge Singal stated:
>
> The Court accepts Plaintiff's allegations regarding his understandable emotional distress. However, the Court cannot conclude that Plaintiff's allegations are sufficient to satisfy the necessary second element for an IIED claim.
>
> Here, Plaintiff alleges that after he defaulted on his payments, [the bank] proceeded to file a foreclosure action without first giving required notice to the VA. This conduct does not rise to the level of being "so extreme and outrageous as to exceed all possible bounds of decency." In reaching this conclusion the Court accepts Plaintiff's characterization of [the bank's] failure as "wrongful and illegal" and readily acknowledges that [its] failure led to the dismissal of the underlying foreclosure action. However, this failed attempt at foreclosure cannot be reasonably characterized as atrocious and utterly intolerable conduct sufficient to state an IIED claim.

*Id*. at *8 (citations omitted) (footnote omitted).[6]

In *Hamilton*, the "litany" that Judge Woodcock deemed sufficient to withstand the dismissal of the IIED claim included allegations that the lender not only sent the borrower a default

---

[6] The plaintiff in *Beaulieu* also alleged that (i) he eventually obtained counsel, who sent defense counsel a letter affirming his representation of the plaintiff in all collection activities on the note and mortgage and advising that any direct communication with the plaintiff would cause new and more serious trauma, and (ii) the bank nonetheless sent collection documents directly to the plaintiff and phoned him on Christmas Eve in an attempt to collect on the note. *See Beaulieu,* 2014 WL 4843809, at *3-*4. However, as the Foggs' counsel observed at oral argument, these allegations do not appear to have been pled as a basis for the IIED claim, *see* First Amended Complaint (ECF No. 7), *Beaulieu*, ¶¶ 82-87, and Judge Singal did not discuss them in considering whether the plaintiff stated a claim for IIED, *see Beaulieu,* 2014 WL 4843809, at *8.

notice in which every listed debt and fee was incorrect but also changed locks on his second home, barred entry until payment arrangements were made, allowed its agents to enter his home without permission, and posted a variety of notices on his property indicating that foreclosure proceedings were in process. *See Hamilton*, 2015 WL 144562, at *3.

At oral argument, with the aid of a chart that she supplied comparing the IIED claims in this case with those in *Beaulieu*, the Foggs' counsel contended that, whereas *Beaulieu* concerned one incident, her clients alleged repeated incidents of misconduct, namely, that Ocwen sent them 12 debt collection demands from November 1, 2013, through January 4, 2015, and inaccurately reported to credit agencies that they had a debt with a balance due of more than $140,000. She emphasized that the collection demands persisted not only after the entry of the consent judgment but also after the recording of the discharge of the Foggs' mortgage, after the Foggs engaged counsel, who sent two cease and desist letters, and after the filing of the instant complaint. She added that, whereas the plaintiff in *Beaulieu* alleged only emotional harm (increased stress and emotional distress, an increase in nightmares, and substantially more severe, painful, and harmful PTSD), her clients alleged not only emotional harm (including shock, frustration, distress, and anxiety) but also a decline in physical and emotional health (including shortness of breath, pain, soreness, headaches, lack of sleep, irritability, and depression) and strain on their relationship.

She argued that, by contrast, this case aligns closely with *Hamilton*, in which, in the portion of the underlying recommended decision addressing the borrower's claim of IIED, Magistrate Judge Nivison stated:

> Not insignificantly, Plaintiff's claim of intentional infliction of emotional distress . . . incorporates all of the allegations of the complaint. Plaintiff's claim, therefore, includes a claim that Defendants made representations with the knowledge that they were false or in reckless disregard of whether they were true or false (i.e., with malice). If true, this would be conduct so extreme and outrageous as to exceed all

15

> possible bounds of decency, and be regarded as atrocious and utterly intolerable in our civilized society.

*Hamilton*, 2014 WL 7508808, at *7 (D. Me. July 30, 2014) (rec. dec., *aff'd in part, overruled in part*, Jan. 12, 2015) (citation, internal quotation marks, and footnote omitted). She asserted that here, as in *Hamilton*, Ocwen repeatedly made representations with the knowledge that they were false or with reckless disregard of their truth or falsity, continuing to dun the Foggs in violation of the terms of the consent judgment even after the instant suit was filed.

Ocwen's counsel rejoined that this case is more like *Beaulieu* than *Hamilton*, distinguishing *Hamilton* on the basis that Ocwen is not alleged to have had direct contact with the Foggs or their property, which they had long since vacated, and arguing that the fact that multiple statements were sent does not transform the sending of notices into extreme, outrageous, and atrocious conduct.

I find this case closer to *Beaulieu* than *Hamilton*. While the claim of IIED in *Beaulieu* was predicated on one allegedly illegal and wrongful incident, it was different in kind from the multiple incidents alleged here. The single incident at issue in *Beaulieu* – the bank's failure to provide a mandatory notice of foreclosure to the VA – allegedly triggered a chain of events that led to the plaintiff's abrupt departure from his home, the ruination of his home's value, and the severe exacerbation of his preexisting PTSD. Even taking into account the Foggs' allegations that they have suffered severe consequences, including emotional distress, a decline in health, and relationship difficulties, the predicate of their IIED claim is that Ocwen wrongfully and illegally continued to send dunning notices, as well as filing a false report with credit agencies. The fact that they received a dozen dunning notices does not, in my view, render Ocwen's conduct extreme, outrageous, atrocious, and utterly intolerable in a civilized society, *see Beaulieu*, 2014 WL 4843809, at *8, *versus* the conduct of the lender in *Beaulieu*.

In addition, the conduct at issue here is materially distinguishable from that at issue in *Hamilton*. In affirming Magistrate Judge Nivison's recommendation to deny the lender's motion to dismiss the borrower's IIED claim, Judge Woodcock made clear that he viewed the borrower's "long litany of allegations against" the lender sufficient to withstand dismissal of his IIED claim. *See Hamilton*, 2015 WL 144562, at *16. In this case, unlike in *Hamilton*, there are no allegations that Ocwen set foot on the Foggs' property, posted any notices thereon, or even telephoned the Foggs. *Compare id*. at *3.

In sum, the conduct alleged by the Foggs, like that alleged by the plaintiff in *Beaulieu*, cannot reasonably be viewed as "so extreme and outrageous as to exceed all possible bounds of decency[,]" "atrocious," and "utterly intolerable in a civilized community[.]" *Beaulieu*, 2014 WL 4843809, at *8 (citation and internal quotation marks omitted).

The Foggs' IIED claim, accordingly, is futile.[7]

---

[7] Other caselaw cited by the Foggs, *see* Reply at 7-8, does not persuade me otherwise. Two of those cases concern conduct of a wholly different nature than that at issue here: the defendant's alleged participation in the robbery of a pizza delivery person, during which the delivery person was assaulted, suffering serious injury to her face, *see Curtis v. Porter*, 2001 ME 158, ¶ 2, 784 A.2d 18, 20, and a landlord's "total lack of response" to tenants' complaints of conditions that included insect and rodent infestations, dead animals, and snow falling into the apartment, *see Harris*, 756 A.2d at 509, ¶ 32. The case of *Colford v. Chubb Life Ins.*, 687 A.2d 609 (Me. 1996), which is cited by Ocwen as well as the Foggs, *see* Opposition at 6, does not help them. There, the Law Court upheld the trial court's set-aside of a jury verdict in the plaintiff's favor on his IIED claim against a disability insurer, reasoning that, although the plaintiff "presented evidence of a cumulative number of acts and circumstances that adversely affected him in a substantial way," he had failed to demonstrate, *inter alia*, that the acts taken in the course of denying his disability claim were so extreme and outrageous as to exceed all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society. *Chubb*, 687 A.2d at 617. As the Foggs point out, *see* Reply at 7, in *U.S. Bank, N.A. v. Sawyer*, 2014 ME 81, 95 A.3d 608, the Law Court recognized that home-loan borrowers went through "significant emotional upheaval" as a result of "failed promises by the Bank" in efforts to negotiate an alternative to mortgage foreclosure, *see Sawyer*, 2014 ME 81, ¶ 16, 95 A.3d at 612. However, *Sawyer* did not concern the viability of an IIED claim but, rather, the appropriateness of the imposition of the sanction of dismissal with prejudice of a foreclosure action on account of the defendant bank's failure to cooperate and participate meaningfully in the foreclosure mediation process. *See id*. at 612, ¶ 17. The Foggs finally cite what appears to be an unpublished case, *Distasio v. Residential Mortg. Servs., et al*., Docket No. BCD-WB-CV-09-06 §X (December 2009), *see* Reply at 7, but neglect to provide a full citation that includes reference to the issuing court or to supply a copy of the case.

### B. Addition of New Parties

In passing, Ocwen argues that the Foggs fail to explain why the addition of the new parties is necessary to "ensure complete relief and finality." Opposition at 1-2; *see also id*. at 3. To the extent that Ocwen means to argue that the addition of those parties is futile, I find that it is not. The Foggs allege that Bank of America, at all relevant times, was the Master Servicer of the Foggs' loan and that Mellon Bank, at all relevant times, was the trustee of the trust that obtained their loan and accompanying mortgage. *See* Proposed Complaint ¶¶ 6-8, 23. They further assert that, at all relevant times, Bank of America was acting under the authority of, and as agent for, Mellon Bank, and Ocwen was acting as the subservicer and agent for Bank of America and Mellon Bank. *See id*. ¶¶ 12-13. On these facts, they assert a plausible claim that Bank of America and Mellon Bank may be liable for Ocwen's conduct. *See* Motion at [5]-[6]; *Jones v. Federated Fin. Reserve Corp*., 144 F.3d 961, 965 (6th Cir. 1998) (principal may be vicariously liable for agent's tortious conduct, including credit reporting violations, under various theories); *In re Hart*, 246 B.R. 709, 736 (Bankr. D. Mass. 2000) (owner of residential note and mortgage found vicariously liable for servicing agent's alleged violation of Massachusetts Consumer Protection Act); *Dupuis v. Federal Home Loan Mortg. Corp.*, 879 F. Supp. 139, 144 (D. Mass. 1995) (as a matter of Maine and federal common law, an owner of a residential note and mortgage who is an "undisclosed principal" is liable for the failures and excesses of a loan servicer who is its "general agent").

### III. Conclusion

For the foregoing reasons, the Motion is **GRANTED** with respect to the Foggs' bid to add additional factual allegations, add Mellon Bank and Bank of America as defendants, and add a claim against all defendants for violation of the Maine Consumer Credit Code, and otherwise

**DENIED**.  The Foggs shall file, no later than April 15, 2015, an amended complaint on the docket that is consistent herewith.

## *NOTICE*

*In accordance with Federal Rule of Civil Procedure 72(a), a party may serve and file an objection to this order within fourteen (14) days after being served with a copy thereof.*

*Failure to file a timely objection shall constitute a waiver of the right to review by the district court and to any further appeal of this order.*

Dated this 8th day of April, 2015.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge
